You may begin whenever you're ready. Good morning. Juan Monteverde with Monteverde & Associates for Appellant. From Senator Williams' words, what this bill would do is to provide the same kind of disclosure requirements which now exist, for example, in proxy contests. Those were the words of the sponsor of the Williams Act bill. They wanted to ensure shareholders were protected and received adequate information when they were presented with a decision to make on a merger, may it be through a proxy or may it be through a recommendation statement. What we're arguing here today is that 14E, which governs a tender offer, should have the same level of culpability that a merger with a proxy on 14A. The Supreme Court has actually spoken on this issue, that you may have different levels of culpability or distinct levels of culpability in a statute, and that was Aaron v. SEC in 1980. The 17th Act or the 33rd Act, Section 17, has three provisions, 1, 2, and 3. Under Section 2A2, that's negligence because that deals with information, where 1 and 3, they deal with the fraudulent type of conduct that deals with scienter. And we're asking that we use that analogy on a 14A claim and that negligence be the standard. What we're really arguing, I think, is— Even though that goes against five other circuits. The other five circuits, with all due respect to those five other circuits, did not do a proper analysis, and in every instance, two things happened. Either they were focused with a claim that dealt with the second clause of 14E, which is the fraudulent, deceptive, manipulative practices and acts type case, or, like in Digital Island, the parties stipulated that scienter should be applicable. And the mistake, I think, begins in 1973 with Chris Craft. But Chris Craft didn't, before we beat up on the other circuits too much, those cases were decided without the benefit of Ernst and Ernst and Aaron, right? So they didn't have the Supreme Court bisecting or dissecting the multi-part 17A, B, and C, right? Indeed. Has anybody done that? Nobody has done it. And Smallwood is the first case from the Fifth Circuit, and that's the problem. It did not dissect or consider Aaron v. SEC. It went straight to Chris Craft. And Chris Craft, essentially, in 1973 said, I'm looking at an anti-fraud provision, scienter applies because Rule 10b-5 has scienter, and they just roll, and that's a snowball effect we've had.  It's not an illogical conclusion, of course. It seems like a very rational conclusion until you look at these intervening Supreme Court decisions, and that gives us, I think that's your argument, it gives us pause for pause. And the academia that has written on this, Professor Loss, the grandfather, intellectual grandfather of the Exchange Act, Lowenstein, Coyler, they all agree with us. We're not coming up with this idea.  And the comma and the or in the statute, 14e, that separates the two clauses should be interpreted as Aaron v. SEC. Since we're talking about commas and really getting into the grand, you know, the opposing counsel has an argument that it's a different format, that they're formatted differently. What about that? And that's really what it is. So United States v. Sheldon, McFarland, they both explain commas and or have the same meanings as enumerating something. They're distinct alternatives. This is just a style thing. And I think it makes sense because it's two clauses, frankly looks prettier with a comma and an or separating it, than with a one and a two. Every time you see a one and a two, you're waiting for a three. There's no three. There's one, disclosure on true statements that should be negligent, and two, fraudulent, deceptive practice acts that should be scienter. So I'm not sure I understand. Do the style points cut in your favor or in opposing counsel's favor? Why do they cut in your favor? They cut in my favor. You just think they're immaterial. They don't matter. No, no, I'm saying they are material because they cut in my favor that we can't separate the sentence, and that's what Emulix really is arguing. That's one sentence. Well, that the Fifth Circuit did not. The Fifth Circuit, I mean, they had that. They had the format. They didn't have the benefit of the intervening Supreme Court cases. They didn't have the benefit of the intervening cases, and they didn't have an analysis. And nobody has had the case. The only case is Digital Island that dealt with disclosure issues, which one could argue that was dealing with the first clause of 14E. And there the parties stipulated that scienter apply. There was no briefing on that issue. Counsel, if I may, I'd like to turn to a different issue because your time is short. I would like to ask about materiality and why the one-page premium analysis, which is dense to read at best, meets the statutory standard of being a material fact necessary to make the statements not misleading in light of all the circumstances. The summary of the Goldman Sachs report seems to me to accurately represent their ultimate opinion, which was that the offer was fair. And there were many, many other reasons why the defendant described that they thought the merger was fair. So I guess I'm concerned about whether this meets the materiality standards. Sure. Two things. Materiality should be a question of fact. It should have not been decided on a motion to dismiss. Put that aside. I do think it's material for shareholders to know Goldman Sachs performed a number of analysis, including a premium split analysis, which was not disclosed. But there were other places where they said these are not even the companies that are most closely similar to Amulex. So it just seems like a very tangential fact. They'll never be similar because that's what an analysis is, and that's how bankers look at intolerable companies. There were two areas. They compared some companies that they thought were more similar, and then this premium analysis was a different list of companies. And I guess I'm just ordinarily materiality is a question of fact. I recognize that. But at some point, any factor is permissible as a topic of summary judgment if the record so reflects. Anyway, I'm concerned about why it's material. We do have in a reply brief a case on point from Delaware Supreme Court, the RBC case. I'm asking for facts and not for citations. So what makes this matter to a reasonable investor in light of everything else that was disclosed and in light of the entirety of the Goldman Sachs opinion? 26.4% is the premium they touted, 13 times in the recommendation statement. That's not a high premium. Most shareholders would have thought that was a good premium the way the document is written. That's on the record ER 96 and 97. And the analysis would have shown that the median was 50%, which is approximately $117 million more in consideration for shareholders. That's a lot of money that shareholders are not aware they could have potentially got, and the tender was approved only by 60%. That's not a high approval rating for a tender offer. This information is the type of information, which we also submitted in excerpts, that other recommendation statements would have disclosed. It was not disclosed here, and we believe the reason was it didn't look favorable. And they wanted to tout that this was a 26% premium for the day before trading and not disclose that in other transactions, which are similar in the sense that they are merger transactions. They would have had a median of 50.8%, if I recall correctly. That's double. It's a factor of two we're fighting over. Would anything else be developed regarding materiality before the district court, or if we sent this back? I think if we send this back, and we send it back on a negligence standard, I think we should be able to survive a motion to dismiss, and then we get to the point of what banker's advice was given on regards to the premium, what the board understood the adequate premium should have been, and shareholders now would be able to recover monetary losses. I'm just trying to figure out if there's agreement here with your position, and I don't know if I can't speak for the panel. I'm just trying to figure out. So we would send it back because we can't make a determination of fact, and you think that there's further factual development, or that the district court is the only one who can make that determination of whether or not there's a genuine issue of fact based on this materiality question? I think it would remand for further proceedings, and I do think the district court could view the issue of materiality at a later time, at a summary judgment. I don't think it was appropriate to discuss it at a motion to dismiss. When we have documents that contradict or support plaintiffs. Decisional development, what happened? What else is there to do? Factually. We would have to take this. I mean, factually, we would go back to the district court, and we would want to conduct further discovery on what the board understood this analysis to mean, whether the board sought advice from their bankers, because that's what you would need to establish liability at trial, is what the board really understood. But how does that bear on what a reasonable investor would, how they would make a decision if they knew that, notwithstanding that there were other higher percentages out there in the majority of cases, that this was in the range of normal and ultimately Goldman Sachs said it was fair. So are there other facts that a reasonable investor would know? Well, the reasonable investor would have wanted to know this information, and now we cannot go back in time. No, no, I understand that. But the question, I'm sort of pursuing this issue of what other facts would be developed concerning specifically the issue of materiality and whether this disclosure would be necessary to make the statement not misleading in the context in which it appeared. It should have been disclosed. The fact that it wasn't disclosed, we know that today. Okay. So that's already in the record. It's already in the record. Is there anything else that would be in the record on that question? I don't think so at this time. Okay. So then your position is that we can't make that determination. Only a district court can. Correct. And my position is that it shouldn't be done at a motion to dismiss. Right. Oh, you would then argue that to the district court. Especially when plaintiffs are alleging facts with actual documentation. But you're not saying that any time there's a question of materiality, it survives a motion to dismiss. I'm saying in this specific case because we actually have factual support. We have evidence what Goldman Sachs did, what the board received, and we have evidence that that was not shared with the shareholders. So we do have a specific case. But I think you're also saying that you wouldn't have to do any further factual development on remand regarding materiality. Is that right? That's correct. For remand, we would then have traditional discovery to strengthen our claim. But you would do? I think you've said both things. I've misunderstood you. I think I misunderstood the question. On remand, would you do additional discovery? Is there more that needs to be developed in order for the court to rule its summary judgment about materiality? I think you would want testimony also supporting what the board understood the analysis to mean. What about Judge Graber's point? The question is what a reasonable investor would understand. And that, I think, would be something that we'd introduce with an expert on what a reasonable investor would have understood. And that's not on the record yet? That's not on the record, no. Okay. I would like to touch briefly on why we don't think CNTR applies to 14E. But also importantly, even if this court were to proceed with CNTR on 14E, 14D4 should have a private course of action because it's identical to 14A. In fact, the language is similar. It has the same words, protecting the investors. And there's one case directly on point, which is the electric specialty company versus international controls. There, the Second Circuit affirmed the district court's opinion that shareholders had standing on 14E and 14D1. 14D1 is similar to 14D4. The difference is 14D1 is for 5% holders that are making the offer, and 14D4 would not apply to someone that has no holdings. Did you want to save some rebuttal time? I'm going to save one minute. The district court also relied on erroneous rulings regarding the issue of 14D4. It relied on Washburn, which there was no solicitation in there. And in Erickson, similarly, there was no shareholder. Those were note holders. So at a minimum, we must stop citation without explanation, which is what happened with the 14D4 argument and the lack of private course of action. We do think we do have a private course of action, as also stated in our brief. I will leave the remaining time for rebuttal, if I may. Thank you, counsel. Good morning. May it please the Court, my name is Erick Landau, and I represent Emulex Corporation and its directors, certain of the appellee defendants. To address the questions on appeal, one of Emulex's computer programmers,  he would invoke the short-circuit evaluation technique. In legal parlance, this court may affirm if there is any deficiency in plaintiff's case. I'll be referring to that as the short-circuit evaluation technique, given the computer-based aspects of the case. Now, at this point, there would be no reason for the court to go beyond the one issue it needs to address to resolve this appeal. There would be no need, as learned counsel advocates, for issues to be addressed regarding scienter, materiality, and implied rights of action. The single issue is falsity. In other words, there is no actionable omission. And the three documents, and only three that need to be reviewed, are the financial advisor's Goldman's presentation to the board, Emulex's tender offer recommendation statement, and, of course, the amended complaint. So is it your position that in an omissions context, falsity is required? That is correct, Your Honor. And if I may go back... I don't understand that. Well, it is the district, when Judge Carney looked at this, he said false misrepresentation and omissions. Now, it's very difficult to say how do you have a false omission. Did you argue this before Judge Carney? False omissions? We talked about omissions itself and actionable omissions. It seems like you're introducing a new area here of the falsity. No, we focused, and in fact, in one of the footnotes in Judge Carney's opinion, he focused both on falsity and scienter, and said that given the Ninth Circuit, given this Court's view, the traditional analysis could be collapsed into one. But he did find... The statute doesn't appear to require falsity in the omissions context. It requires that there be an omission of a material fact. This is what I talked to opposing counsel about, a material fact, and I'll paraphrase, necessary to make the statement not misleading in all the circumstances. So I'm not really sure what falsity is about. It's either material in that sense or it's not. Your Honor... Context-specific. ...raises a good point, and this is context-specific. I was keying off of Judge Carney's collapsing of the two and using the term... Okay, but there's a reason we're all ruffling our papers up here, because this is striking as a new argument. I'm not sure if this is really where you want to spend your time considering. No, I don't. And particularly because we have de novo review on this, and it doesn't matter what the district court thought. Okay, let's go back then and look at the omission in what I'll call a more traditional analysis, and that is plaintiff argues that our recommendation statement is false and misleading. Why? Because no reference is made to the chart. We need to go back and find a contradiction. This is where I think we look at falsity. We have to find something in the recommendation statement. Well, the issue, I mean, to cut to the chase, the issue is that while the premium percentage was within the normal range, it was below average, below the mean, and below the anyway, I'm not good with all the correct terms, but it was in the bottom quarter, let's say, of the comparables that Goldman Sachs looked at, and according to the plaintiffs, an investor would want to know that this percentage is lower than the percentage in other cases. It's that simple. And so the question is whether a reasonable investor actually would care about that when the ultimate conclusion of Goldman Sachs was that the offer was fair for a variety of reasons, not all of them having to do with the premium percentage. Your Honor, I think there may be a misunderstanding here, Ed, because of plaintiffs' characterization of the selected semiconductor transactions versus the comparable analysis. Right. That's what I was asking him about. There are two sets of comparisons, and the one that he's focused on is not the most comparable companies, but that goes to what you call a traditional materiality analysis. Is there argument that this omission was not material in context? Yes, Your Honor. Okay, so why not? Absolutely. That's what we want to know. Okay. If we focus on number one, this chart supports the tender offer. It falls within, even if we assume that this is EMILEX's space, and it is not. The semiconductor space is not where EMILEX is. EMILEX is in the connectivity space where business computers are connected with data storage facilities. They are not a semiconductor manufacturer. But even if we assume that that chart was comparable, which it's not, and nowhere in the analysis, either of Goldman Sachs or the summary of the analysis by EMILEX, do they state otherwise? So what happens? We're still within the range of premiums. So number one, we are within the range. Goldman Sachs comes back and says this is fair, which is what the shareholders need to know. But more importantly, more importantly here, what is the rule that plaintiff's looking at now? EMILEX is not being faulted by plaintiff for saying anything wrong in its recommendation statement. No. In fact, they believe that all of our facts are literally true. But to win, don't you have to, on materiality, don't you have to convince us that as a matter of law, not fact, as a matter of law, no reasonable investor would want that information? That is correct, Your Honor. Okay. However, no reasonable ---- Well, forgive me, but I know I'm interrupting, but is it your position, basically, that no reasonable investor would find that material because it's not a fair comparable? Well, let's go back, though, to TSC. It's not whether or not the reasonable investor, and I apologize for not parsing words but looking at the language of TSC. Oh, that's fine. Okay. TSC says there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information. And I think the cases, I know the cases have made clear. It's not whether or not a shareholder would have found it helpful. It's not whether or not they would have liked to have had it. And certainly it's not to duplicate the analysis of the financial process. I'm sorry. Why isn't that a question of fact for ---- There are no facts here that are in dispute. When we say questions of fact, for a trier of fact to resolve. What about the ---- I'm sorry. I'm sorry. I'm just wondering, is this the kind of thing that an expert would opine on, on whether or not a reasonable investor, this is something they would look at or they would do shareholder surveys? And I don't know. I don't know, but I ---- Even if the standard is significantly alter the mix. Why isn't that a question of fact? Why isn't that? Again, while someone may be able to tender an expert, who is going to state that this will or will not alter the total mix, whether it is the district court or the justices on this panel, we do not check common sense at the door, because we can look at the undisputed facts contained in this record. And remember, plaintiff had the opportunity for discovery because they threatened a preliminary injunction, and we produced the board book. We produced the minutes. And the best they could come up with was this chart. Now, they don't need, nor does this court, come back and looking at a chart from an unrelated industry sector, where we fall within the range of the premiums, need to go back and say, what would ---- through the use of expert testimony, but rather using all of our common sense. And I say common sense because this chart supports exactly what Emulex said. Remember, Emulex never touted the premium as substantial, never touted the premium as high, never touted the premium as above average. And that's what I really want to focus on. Plaintiff says, well, you used the word premium umpteen times. Well, of course we did. But what is the investor looking for? The investor is looking to see, is that premium an actual premium, and how was Emulex performing? Not people in another industry space, but how was Emulex performing? Historical, current, projected performance, stock price, discounted cash flows. No one, my learned counsel, contests that all of our analysis is accurate. The comparable company analysis that is contained in the recommendation statement is uncontested. It is uncontested that Goldman Sachs' analysis was appropriate. The question is, does this chart add anything to the total mix? And I think at this point, this Court can say, no, it doesn't. What does it do? Before your time is out, I'd like to ask you questions about the cyanide turn negligence. Do you acknowledge that the Ernst & Ernst case and the Aaron case were subsequent to some of these other circuits weighing in? Yes. And so does that affect, do you concede it was negligence then? I'm trying to figure out. Oh, no, no, no, no, no. Can you make your argument where your time is rapidly evaporating here? No, I do not. I think we have to go back and we have to look at the words of 14E, and we have to say, which statute is it in? Number one, it's the 34 Act. It is not the 33 Act. The 33 Act, which plaintiff wants us to look at, is an entire different investor protection scheme, as opposed to the 34 Act secondary market activities. But more importantly, we look at this Court's ruling, both in NVIDIA and Zucco, and we come back and say the exact language in 10b-5b is the language we're looking at in Section 14E. And I think that's important because we're looking at misrepresentations in omissions where ---- But what about in Aaron? I mean, it seems like it held that the plain language, I think it was 17A2, is identical to the first clause of Section 14E. What's your response to that, which was determined a showing of negligence and not scienter was required? Well, first, Your Honor, the analysis in Aaron started from the premise that the three paragraphs of 17A could not be read together. We do not have the same issue under 14E because we have the same language from 14E, which was modeled on Rule 10b-5. And if we go to 10b-5b, we find the same language there. There was no need to depart in 14E and parse the language because the statute was based on 10b-5. There's no need to go to the 33 Act in Section 17A in order to parse the statute. It's still the same sentence. And it would make no sense where neither Congress nor any other commentator came down and said, wait a second, we're now going to that comma means, with all due respect to Professor Loss. The comma means we are going to have one scienter requirement for one side of the comma, and then we are going to back up and have a negligent standard on the other, especially when we have a scienter standard through NVIDIA and Zucco, which it applies to both misrepresentations and omissions, as well as fraudulent and manipulative acts. I do not see the distinction in this case since we are looking at language that is borrowed from 10b-5. And Ernst & Ernst does not rely on the plain language of Rule 10b. It doesn't seem like it's rooted in the analysis of the plain language there. I'm just trying to see what your view is of that. I think you're just comparing, that the circuits to look at this issue just sort of compared but never did their own independent investigation or analysis of whether or not that language was rooted in the statute. And I think the reason why we don't see a lot of it is because we don't have that history. We don't have it. And so we have to go back and we have to rely on subsequent case law interpretation from the circuits. Even if I concede that we do not have, we do not have it rooted in the language, we now have it rooted in the language. We have all the other circuits. We have all the district courts within this circuit. It really seems like, and we're not making this up, it's in the briefing. I just want to give you a chance to respond to it. But what it feels like is that what we have is a bunch of circuits who are following Smallwood and following cases that haven't really grappled with the issue about this intervening Supreme Court authority. Do you want to respond to that? Because there's kind of basically out of time. So do you want an opportunity to respond to that? No, Your Honor. I still think if we come back and we look at Erin, it also, plaintiff characterizes our argument as one based on policy and argues that the decision in Erin did not pertain to issues of policy. Okay. We do not mention policy in this argument, but rely on the text of the statute. What I want to do is get away, we are going back to the actual words of the statute. We're not asking the court to follow out of fellowship the other circuits or simply because they have gone one way, so should this court. We are going back not to policy, but to the actual words of the statute. And we are comparing those words to Rule 10b-5b. We are coming back and saying there makes no, it makes no sense to have a statute which focuses on the conduct of the parties, Section 14e as well as 10b-5. And it makes no sense for this court then to leap over to 17a, which does not have the same policy considerations and talks instead about money lost due to misrepresentations and omissions. Different words at that point. If we go back to the actual words, I don't think we're going to see it in the legislative histories, but if we go back to the actual words, those words support defense's position because they are identical to the Siander requirement, the words in what is now Siander-required. Thank you, counsel. Thank you. Mr. Monteverdi, you have your turn. Your Honors, I apologize. I represent the acquiring defendants, and we had an agreement for two minutes of time. I'm not sure how you guys, do I just, am I just outlawing it? Well, you are, because normally that would be something that would have to be cleared with the clerk ahead of time, and we weren't aware of it. Do you have, is this something you knew about, or? Okay. Well, why don't we give you one minute. Just come up and tell us what you. Well, I represent the acquiring defendants of AGO, and the only point I'd like to make to your Honors and address a couple points in the reply brief are that we should, those defendants should be excused whatever you decide on the underlying merits of the issues you're going back and forth here for two reasons. One is, as plaintiffs concede in their reply, footnote 13, they have an alleged Siander against our clients. Second, on the negligence standard that you're debating, there's no factual allegations that would sustain negligence. There's one in paragraph 151 that says we must have seen the analysis that's the one page missing, and we would respectfully submit that's not enough to support a negligence standard. Second independent argument, we didn't make the statements under Janus. The language of the Statute 14E that's at issue here requires that you make a statement. We were the acquiring company. We didn't make the statement. If you look at Janus, even substantial assistance isn't enough. There's no allegation of any kind of input by our client. I'm sorry. Who do you represent? I represent the acquirer of AGO. Okay. So even, however you resolve the issues that counsel have been debating today, there are no allegations that we were a maker of a statement or that we were either negligent or Siander. The only comment I'd add on the underlying materiality issue you're talking about, I believe all the information in the missing chart was public. So I think the hardest question you have to wrestle with is can you send it back, regardless of how you decide the Siander issue, for a collection of information that was otherwise publicly available to shareholders. Thank you. Thank you, counsel. Mr. Moderati. Yes, thank you. I'm going to be quick. In fact, this court yesterday in Thorotek reminded the matter relying on coterrorist securities. It is misleading if it gave a reasonable investor an impression of a state of affairs that differs in a material way with what actually exists. And that's our point. There is a difference here because they could have got 50 percent premium. They only got 26 percent. They touted it. You can't say, well, you didn't catch us in a lie because we didn't talk about it. Well, but you did say you got a premium. You said it was 26, and that's not within range. If I may try to compare this, if one was looking for a job, I wanted to know what would a salary be for an engineer, a doctor, an attorney. You would look at a comparable analysis for each sector. But if you wanted to ask how much money will you get when you change jobs, it doesn't matter if you're a doctor, a lawyer, or an engineer. You look at a comparable premium spent analysis, so to speak. You always get more money normally when you change jobs. It's the same idea here. When you buy a company and you give that control, you're going to pay a premium. The premium should have been within the median. Shareholders are not aware of that. Footnote 3 of our reply briefs has the RBC decision from Delaware. It would support our position, and we also had evidence, Exhibit 2, in the record, ER-131, another recommendation statement, Volterra, disclosing this analysis. If a banker does an analysis and they got paid $11 million Goldman Sachs for this analysis, shareholders should have a fair summary. They got no summary whatsoever. It is material. That's not true. They got a five-page summary. None of this analysis. I would argue they need to get a summary of each analysis the banker performs, which they gave to the board. And that's why this case should have not been dismissed, and that should be a negligent standard. Thank you very much. Thank you, Counsel. We appreciate the arguments of all three of you, and they were very helpful to us in this interesting case. And that case is now submitted.
judges: Graber, Murguia, Christen